## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| FREDERICK SMITH, on behalf of himself and all others similarly situated, | ) ) ) ) Case No. _____ |
| | ) |
| Plaintiff, | ) **CLASS ACTION COMPLAINT** |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| RADIUS GLOBAL SOLUTIONS, LLC, | ) |
| | ) |
| Defendant. | ) |

Plaintiff and Frederick Smith ("Plaintiff"), by his undersigned counsel, files this Class Action Complaint individually and on behalf a class of all similarly situated persons against Defendant Radius Global Solutions, LLC ("RGS" or "Defendant"). Plaintiff bases the following allegations upon personal knowledge as to his own acts and otherwise on information and belief and the investigation of counsel, and state the following:

### INTRODUCTION

1.     Plaintiff brings this class action on behalf of himself and all other similar situated individuals ("Class Members") whose sensitive personal information was disclosed to unauthorized third parties during a massive data breach that exploited a vulnerability in software technology called MOVEit on or about May 27, 2023 (the "Data Breach").

2.     The Data Breach compromised the personally identifying information ("PII") and protected health information ("PHI") (collectively "Sensitive Personal Information" or "SPI") of Plaintiff and Class Members, including, but not limited to their"

full names; dates of birth; Social Security Numbers; health insurance providers; patient treatment codes; treatment locations; and treatment payment history.[1]

3.      As Defendant is or should have been aware, this type of personal and sensitive data is highly targeted by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to the Class Members.

4.      Indeed, the harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

5.      Defendant RGS is a company that provides outsourced customer service and debt collection to a range of entities nationwide, including healthcare providers. RGS's services include gathering data, collecting medical debt, and outsourcing call centers. As part of its business operations, RGS uses a managed file transfer software called MOVEit.

6.      MOVEit software is likewise used by an extensive number of commercial entities and federal and state governments and agencies to transfer large data files.

---

[1]  *Notice of MoveIt Data Event*, RADIUS (Aug. 2023) https://www.radiusgs.com/wp-content/uploads/2023/08/Radius_Envision-Website_Notice.pdf.

7.      Since the Data Breach on May 27, 2023, a multitude of commercial and governmental entities have announced that their data, and therefore the data of millions of their customers, clients, and/or members, has been impacted. The large number of companies that have announced being impacted by the breach underscores the widespread effect and deep consequences of this Data Breach. Indeed, over 1,000 entities and more than 60 million individuals have been impacted by the Data Breach.[2] The full scope of the Data Breach, however, is not yet known, as entities continue to disclose breaches of their data.

8.      The United States Cybersecurity & Infrastructure Security Agency has identified the data exfiltrators as "CL0P Ransomware Gang," also known as TA505, and reports that the attacks were conducted by exploiting a vulnerability catalogued as "CVE-2023-34362" in order to exfiltrate data from the underlying MOVEit databases.[3]  CISA reports that TA505 has been known both to publish exfiltrated data and to ransom exfiltrated data for profit.

9.      Defendant touts that it is a professional capable of and committed to safeguarding its clients' data and the individuals' information contained in that data.

10.      In reality, Defendant's pronouncements as being a capable data custodian proved false. Contrary to their many representations and promises, Defendant utilized

---

[2] Carly Page, *MOVEit, The Biggest Hack of the Year, By the Numbers*, TECHCRUNCH (Aug.25, 2023), https://techcrunch.com/2023/08/25/moveit-mass-hack-by-the-numbers/.
[3] *#StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability*, CYBERSEC. & INFRASTRUCTURE SEC. AGENCY (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.

inadequate data security measures it knew, or should have known, put the highly sensitive data they oversaw at significant risk of theft by or exposure to nefarious parties.

11.    Plaintiff and the Class Members remain at a continued risk of harm due to the exposure and potential misuse of their sensitive personal information by criminal hackers.

12.    As such, Plaintiff brings this Complaint on behalf of persons whose SPI was stolen during the Data Breach. Plaintiff asserts claims for negligence, unjust enrichment and for declaratory and injunctive relief.

## JURISDICTION

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

14.    This Court has general personal jurisdiction over Defendant RGS because RGS is headquartered in Edina, Minnesota and is registered to conduct business in Minnesota and has a registered office address in Edina, Minnesota.

15.    This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Minnesota and because Defendant conducts a substantial part of its business within this District.

## PARTIES

16.     Plaintiff Smith is an adult, who at all relevant times, is and was a citizen of the State of Georgia. Plaintiff Smith received notice via mail that his personal information was stolen during the Data Breach.

17.     As a result of the Data Breach Plaintiff Smith will continue to be at a heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

18.     Defendant RGS is a Minnesota limited liability company with its principal place of business at 7831 Glenroy Road, Suite 250, Edina, Minnesota, 55439.

19.     Upon information and belief, RGS is a single member limited liability company as it is wholly owned by NGI Acquisition, LLC, a Georgia limited liability company. Upon information and belief, NGI's sole member is Edward Honkisz, who is a citizen and resident of the State of Georgia.

20.     Defendant RGS is a citizen of each state in which one of its members is a citizen. As such, RGS is a citizen of the State of Georgia.

21.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here are currently unknown to Plaintiff.

22.     Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of such responsible parties when their identities become known.

## FACTS

### A.    RGS Provides Technology Services Involving Highly Sensitive Data.

23.    Defendant RGS is a company located in Edina, Minnesota that provides services to entities across the nation, including providing patient billing and debt recovery services to healthcare organizations.

24.    To provide these services, RGS handles the sensitive personal information of hundreds of thousands of individuals, including their names, dates of birth, Social Security Numbers, patient treatment codes, treatment locations, and treatment payment histories, including health insurance providers.

25.    RGS acknowledges how critical it is to safeguard this information—and, therefore, how devastating it is to individuals whose information has been stolen. RGS boasts to potential clients that it has "a focus on keeping customer data secure."[4] RGS also claims to protect personal information through "implement[ing] physical, electronic, and procedural security safeguards."[5]

26.    Upon information and belief, RGS utilizes MOVEit software and/or on-premises hardware to conduct its business operations.[6]

27.    Despite Defendant's promises to protect sensitive data and efforts to portray itself as a capable data custodian, Defendant's own data security decisions created

---

[4] *Retail & Consumer Goods Industry*, RADIUS, https://www.radiusgs.com/industries/retail-consumer-goods/, RADIUS (last visited Sept. 21, 2023).
[5] *Privacy Policy*, https://www.radiusgs.com/privacy-policy/ (last visited Sept. 22, 2023).
[6] *MOVEit Managed File Transfer*, IPSWITCH, https://www.ipswitch.com/moveit (last visited Sept. 22, 2023).

substantial gaps that Defendant knew or should have known created a risk of a data breach. That risk materialized in May 2023, when hackers broke into Defendant's systems and stole highly sensitive data at will and put Plaintiff and the Class at risk that their data would be misused and cause them harm.

**B.    RGS Exposed Highly Sensitive Data to Hackers.**

28.    Beginning on or around May 27, 2023, the notorious CL0P ransomware gang exploited a vulnerability in the MOVEit software and accessed, copied, and stole Plaintiff's and Class Members' SPI.[7] The vulnerability allowed CL0P to escalate user privileges and gain unauthorized access to the MOVEit customer environments, including RGS's.[8]

29.    Following the discovery of the initial vulnerability in the file transfer software, five additional vulnerabilities were subsequently discovered.[9]

30.    Inexplicably, and inexcusably, Plaintiff was not informed that his data was breached until several months later, in September 2023.

31.    However, investigations following CL0P's exploitation of the MOVEit vulnerability have subsequently revealed that CL0P had known about this particular vulnerability and had been experimenting with ways to exploit as far back as 2021.[10]

---

[7] *Supra* note 4.

[8] Matt Kapko, *MOVEit Mass Exploit Timeline: How the File-Transfer Services Attacks Entangled Victims*, CYBERSECURITY DIVE (Aug. 29, 2023), https://www.cybersecuritydive.com/news/moveit-breach-timeline/687417/.

[9] *Id.*

[10] Scott Downie, et al., *MOVEit Transfer Volnerability (CVE-2023-34362) Since 2021*, KROLL (June 8, 2023), https://www.kroll.com/en/insights/publications/cyber/clop-ransomware-moveit-transfer-vulnerability-cve-2023-34362.

32.    Indeed, one security firm's review of "logs of impacted [MOVEit] clients found evidence of similar [malicious] activity occurring in multiple client environments last year (April 2022) and in some cases as early as July 2021."[11]

33.    The security firm "also discovered the threat actors were testing ways to collect and extract sensitive data from compromised MOVEit Transfer servers as far back as April 2022, likely with the help of automated tools."[12]

34.    As such, the 2022 activity and "[t]he malicious activity appeared to be aimed at exfiltrating Organization IDs ("Org IDs") which identified specific MOVEit Transfer users and would have helped Clop determine which organizations it could access."[13]

35.    According to RGS, "[o]n June 1, 2023, Radius [ ] learned of a vulnerability in the MOVEit web transfer application," and only then applied the software patch provided by PSC.[14] This means that RGS delayed at least two days before applying the patch to address the vulnerability in its systems that was allowing CL0P access to Plaintiff's and Class Members' SPI.

36.    Further delay ensued before Plaintiff and Class Members were informed of the Data Breach. After learning about the vulnerability on June 1, RGS did not notify any

---

[11] Sergiu Gatlan, *Clop Ransomware Likely Testing MOVEit Zero-Day Since 2021*, BLEEPING COMPUTER (June 8, 2023), https://www.bleepingcomputer.com/news/security/clop-ransomware-likely-testing-moveit-zero-day-since-2021/.

[12] *Id.*

[13] Simon Hendery, *Ransomware Gang Clop Prepped Zero-Day MOVEit Attacks in 2021*, CYBERRISK ALLIANCE (June 9, 2023), https://www.scmagazine.com/news/ransomware-gang-clop-zero-day-moveit-2021.

[14] *Supra* note 1.

agency nor affected individual until August 4.[15] Defendant failed to disclose the Data Breach to the United States Department of health and Human Services Office of Civil Rights ("HHS") until on or about August 4, 2023—more than two months after RGS first knew that Plaintiff's and Class Members' data had been acquired by cybercriminals.[16]

37.     As a result of Defendant's needless delay, Plaintiff and Class Members did not receive notice of the Data Breach—and therefore could not take remedial steps to protect their credit and accounts from malicious actors—until months after the Data Breach occurred.

38.     While Defendant RGS initially reported that approximately 600,800 individuals were affected, RGS eventually disclosed that the Data Breach compromised the SPI of more than 632,000 individuals.[17]

39.     A wide swath of sensitive information was compromised in the Data Breach, including individuals' names, dates of birth, Social Security Numbers, patient treatment codes, treatment locations, and treatment payment history, including health insurance providers.[18]

---

[15] *Id.*; *see also* "Breach Portal", https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sept. 22, 2023).

[16] Breach Portal, *supra* note 15.

[17] "Radius Global Ups the Count of MOVEit Breach Victims to Over 630,000 Individuals," TEISS (Sept. 20, 2023), https://www.teiss.co.uk/news/radius-global-ups-the-count-of-moveit-breach-victims-to-over-630000-individuals-12865; *see* Data Breach Notification, OFF. ME.ATT'Y GEN. (Aug. 4, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/e857ebe0-16f3-4720-b6bb-04511b443239.shtml; *see also* Breach Portal, *supra* note 15.

[18] *Supra* note 1.

40.     Since the Data Breach, CL0P has begun leaking stolen data on its dark web leak site. Upon information and belief RGS was named on CL0P's leak site, with CL0P claiming to have stolen 69 GB of data from RGS.

**C.     RGS's Insufficient Data Security Caused the Data Breach.**

41.     Security experts, both private and governmental, have long warned companies that data security must be a top priority.  The Federal Trade Commission ("FTC"), for example, has also issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security into all business decision-making.[19] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on  networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[20]

42.     The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or

---

[19] *Start with Security A Guide For Business, Lessons Learned from FTC Cases*, FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[20] *Id.*; *Protecting Personal Information, A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.

practice prohibited by Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act").

43.    As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure SPI such as Social Security numbers, dates of birth, and medical information. *See In the Matter of EPN, Inc.*, No. C-4370, 6 (Oct. 3, 2012) (Defendant, a debt collector for healthcare clients, failed to "use reasonable methods to prevent, detect, and investigate unauthorized access to personal information on its networks," resulting in exposure of SPI such as names, dates of birth, Social Security numbers, and health insurance and medical treatment information); *In the matter of CBR Systems, Inc.*, No. C-4400, ⁋⁋ 9, 11 (Apr. 29, 2013) (Defendant "failed to employ sufficient measures to prevent, detect, and investigate unauthorized access to computer networks" allowing access to unencrypted data including consumers' names, Social Security numbers, dates of birth, and adoption information); *In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (Jun. 15, 2011) ("[Defendant] failed to implement reasonable policies and procedures for the security of sensitive consumer information collected and maintained by [Defendant]." sufficient measures to detect unauthorized access.") These orders, which all proceeded Defendant's Data Breach, further clarify the measures businesses must take to meet their data security obligations.

44.    Although Defendant's business involves handling highly sensitive data, Defendant implemented inadequate data security practices that it knew or should have known put its clients and their customers at risk of having their sensitive data exposed.

**D.    The Data Breach was a Foreseeable Risk of which RGS was on Notice of.**

45.    It is well known that SPI, particularly Social Security numbers, are valuable commodities and a frequent, intentional target of cyber criminals. Companies that collect and handle such information, including Defendants, are well aware of the risk of being targeted by cybercriminals.

46.    Individuals place a high value not only on their SPI, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

47.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[21]

48.    Individuals, like Plaintiff and Class members, are particularly concerned with protecting the privacy of their Social Security Numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

---

[21] ERIKA HARRELL, BUREAU OF JUST. STAT., U.S. DEP'T OF JUST., NCJ 256085, Victims of Identity Theft, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf. https://www.ssa.gov/pubs/EN-05-10064.pdf

49.    Data Breach victims suffer long-term consequences when their Social Security Numbers are taken and used by hackers. Even if they know their Social Security Numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security Number misuse.

50.    The Social Security Administration has warned that:

"a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[22]

51.    In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[23] While data breaches decreased slightly to 1,802 in 2022, over 422 million people were affected, representing a 40 percent increase from 2021.[24]

52.    Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-

---

[22] "Identity Theft and Your Social Security Number," SOC. SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[23] Bree Fowler, *Data Breaches Break Record in 2021*, CNET (Jan. 24, 2022) https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says.
[24] Bree Fowler, *Data Breaches Hit Lots More People in 2022*, CNET (Jan. 25, 2022), https://www.cnet.com/tech/services-and-software/data-breaches-hit-lots-more-people-in-2022.

states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[25]

53.    In light of high-profile data breaches at other companies, RGS knew or should have known that its computer systems would be targeted by cybercriminals.

54.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

55.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[26] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[27]

---

[25] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.
[26] Ransomware Safety Resources, FED. BUREAU INVESTIGATION, https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-%20safety/common-scams-and-crimes/ransomware (last visited Sept. 22, 2023).
[27] *Id.*

56.     Despite the prevalence of public announcements of data breaches and data security compromises, and despite their own acknowledgment of their duties (and professed capabilities) to keep SPI private and secure, RGS failed to take appropriate steps to protect the SPI of Plaintiff and the proposed Class from being compromised.

**E.    At All Relevant Times RGS Had a Duty to Properly Secure SPI.**

57.     At all relevant times, Defendant had a duty to Plaintiff and Class Members to properly secure their SPI, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to promptly notify Plaintiff and Class Members when Defendant became aware that their SPI was compromised.

58.     Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

59.     Security standards commonly accepted among businesses that store SPI accessible to the internet include, without limitation:

        a.     Maintaining a secure firewall configuration;

        b.     Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

        c.     Monitoring for suspicious or irregular traffic to servers;

        d.     Monitoring for suspicious credentials used to access servers;

e.      Monitoring for suspicious or irregular activity by known users;

f.      Monitoring for suspicious or unknown users;

g.      Monitoring for suspicious or irregular server requests;

h.      Monitoring for server requests for SPI;

i.      Monitoring for server requests from VPNs; and

j.      Monitoring for server requests from Tor exit nodes.

60.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[28] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[29]

61.    The ramifications of Defendant's failure to keep consumers' SPI secure are long lasting and severe. Once SPI is stolen, particularly Social Security Numbers, fraudulent use of that information and damage to victims including Plaintiff and the Class may continue for years.

**F.    Sensitive Personal Information Is Highly Valuable.**

62.    The SPI of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for

---

[28] 17 C.F.R. § 248.201(b)(9) (2013).
[29] *Id.*

stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[30]

63.    Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[31]

64.    Social Security Numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security Number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[32]

65.    Attempting to change or cancel a stolen Social Security Number is difficult if not nearly impossible. An individual cannot obtain a new Social Security Number without evidence of actual misuse. In other words, preventive action to defend against the

---

[30] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[31] *In the Dark*, VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark.

[32] *Supra* note 22.

possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

66.    Even a new Social Security Number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

67.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[34]

68.    SPI can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security Number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[35]

69.    Given the nature of this Data Breach, it is foreseeable that the compromised SPI can be used by hackers and cybercriminals in a variety of devastating ways. For example, cybercriminals who steal data or buy stolen data use that information can make

---

[33] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft

[34] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, COMPUTER WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.

[35] *See* Memorandum, *Safeguarding Against and Responding to the Breach of Personally Identifiable Information*, OFF. MGMT. & BUDGET (May 22, 2007), https://georgewbush-whitehouse.archives.gov/omb/memoranda/fy2007/m07-16.pdf.

fraudulent transactions, commit identity theft, file fraudulent tax returns, and extort individuals to whom the SPI belongs.[36]

70.    Much of the SPI compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security Numbers).

71.    Moreover, Defendant has offered little to no remedial measures to Plaintiff or Class Members to protect their SPI and credit going forward. RGS puts the onus on Class Members to seek out credit reports, place fraud alerts or credit freezes, and to "educate **yourself** regarding identity theft, fraud alerts, credit freezes, and the steps **you** can take to protect your personal information;"[37] Though RGS has offered two years of identity monitoring and protection services, this time-limited monitoring is inadequate given that Defendant's victims are likely to face many years of identity theft.[38]

72.    Defendant's "remedial" advice to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on Defendant, to monitor and report suspicious activities to law enforcement. In other words, Defendant expects Plaintiff and Class Members to protect themselves from Defendant's tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent

---

[36] Ravi Sen, *Here's How Much Your Personal Information is Worth to Cybercriminals – and What They Do With It*, PBS NEWSHOUR (May 14, 2021), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it.
[37] *See supra* note 1 at "Monitor Your Accounts" and "Additional Information."
[38] *See id.* at "What We Are Doing."

instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

73.     These extremely limited remedial measures—or advice for Plaintiff and Class Members to themselves take remedial measure—are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' SPI.

74.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

**G.     RGS Failed to Comply with FTC Guidelines.**

75.     Federal and State governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[39]

76.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[40] The guidelines note that businesses should protect the personal

---

[39] *Supra* note 19.
[40]*Supra* note 20.

consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

77.    The FTC emphasizes that early notification to data breach victims reduces injuries: "If you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused" and "thieves who have stolen names and Social Security numbers can use that information not only to sign up for new accounts in the victim's name, but also to commit tax identity theft. People who are notified early can take steps to limit the damage."[41]

78.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[42]

79.    The FTC recommends that businesses:

a.    Identify all connections to the computers where sensitive information is stored;

b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

---

[41] *Id.*

[42]    *See* Progress, *Ransomware Vulnerabilities in File Transfer*, https://www.ipswitch.com/resources/whitepapers-ebooks/ransomware-vulnerabilities-in-file-transfer (last accessed Sep. 22, 2023).

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network.

Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

80.  The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.  Because Class Members directly or indirectly entrusted Defendant with their SPI, Defendant had, and has, a duty to the Plaintiff and Class Members to keep their SPI secure.

82.  Plaintiff and the other Class Members reasonably expected that when they provided SPI to Defendant's clients, RGS would safeguard their SPI.

83.     Defendant was at all times fully aware of its obligation to protect the personal data of consumers, including Plaintiff and members of the Class. Defendant was also aware of the significant repercussions if it failed to do so.

84.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiff's and Class Members' first names, last names, addresses, and Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**H.    Plaintiff and Class Members Have Suffered Concrete Injury as a Result of RGS's Inadequate Security.**

85.     Plaintiff and Class Members reasonably expected that RGS would provide adequate security protections for their SPI. Plaintiff and Class Members provided to Defendant, directly or indirectly, sensitive personal information, including Plaintiff's and Class Members' names, addresses, and Social Security numbers, and other SPI.

86.     Cybercriminals intentionally attack and exfiltrate SPI in order to exploit it. Thus, Plaintiff and Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft. Plaintiff and Class Members have also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of monitoring his accounts.

87.     The cybercriminals who obtained the Plaintiff's and Class Members' SPI may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web." Having obtained these names, addresses, Social Security numbers,

and other SPI, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

     a.     obtaining employment;

     b.     obtaining a loan;

     c.     applying for credit cards or spending money;

     d.     filing false tax returns;

     e.     stealing Social Security and other government benefits; and

     f.     applying for a driver's license, birth certificate, or other public document.

88.    In addition, if Plaintiff's or Class Member's Social Security Number is used to create false identification for someone who commits a crime, Plaintiff or the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

89.    As a direct and/or proximate result of RGS's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and other Class Members have been deprived of the value of their SPI, for which there is a well-established national and international market.

90.    Furthermore, SPI has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for fraudulent misuse of this information to be detected.

91.    Accordingly, RGS's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the other Class Members at an imminent, immediate,

and continuing increased risk of identity theft and identity fraud. Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach." Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[43] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' SPI will do so at a later date or re-sell it.

92.    As a result of the Data Breach, Plaintiff and Class Members have already suffered injuries, and each are at risk of a substantial and imminent risk of future identity theft.

## I.    Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft.

93.    Data Breaches such as the one experienced by Plaintiff and Class Members are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

94.    In 2019, the United States Government Accountability Office ("GA") released a report addressing the steps consumers can take after a data breach.[44] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five

---

[43] Al Pascual, The Consumer Data Insecurity Report: Examining The Data Breach- Identity Fraud Paradigm In Four Major Metropolitan Areas, JAVELIN (June 30, 2014), https://javelinstrategy.com/research/consumer-data-insecurity-report.

[44]    Government    Accountability    Off.,    "Data    Breaches"    (Mar.    2019) https://www.gao.gov/assets/gao-19-230.pdf.

pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a Data Breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

95.     The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[45]

96.     The FTC, like the GAO recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[46]

97.     Theft of SPI is also gravely serious as SPI is a valuable property right.[47]

98.     It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when

---

[45] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," Government Accountability Off. (June 2007), https://www.gao.gov/new.items/d07737.pdf ("2007 GAO Report").

[46] See Identity Theft Victim Checklist, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited Sept. 22, 2023).

[47] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("SPI") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("SPI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

SPI is stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[48]

99.    SPI is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

100.    There is a strong probability that the entirety of the stolen information has been or will be dumped on the black market, meaning every Class Member, including Plaintiff, is at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

**J.    Plaintiff's Experiences.**

101.    Plaintiff Smith is a resident of the State of Georgia who received a data breach notification from RGS informing him that his SPI had been compromised in the Data Breach.

---

[48] *See* 2007 GAO Report, at 29.

102.    RGS has not provided Plaintiff Smith with any remedial measures.  While RGS has taken its own initiative to offer credit monitoring, this offer is time-limited and will expire long before the threat to Plaintiff Smith's SPI is exhausted.

103.    Plaintiff Smith suffered actual injury from having his sensitive information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including needing to financial accounts and statements, and other accounts and statements to ensure his information is not being used for identity theft and fraud; (b) changing passwords to his various financial and medical accounts to ensure his information is not being used for identity theft and fraud; (c) damages to and diminution of the value of the SPI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (d) loss of privacy; (e) continuous, imminent, and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (f) time and expense of mitigation efforts required as a result of the Data Breach.

104.    In addition, knowing that hackers accessed and exfiltrated Plaintiff Smith's SPI and that this likely has been and will be used in the future for identity theft, fraud, and related purposes has caused Plaintiff Smith to experience significant frustration, anxiety, worry, stress, and fear.

105.    Despite RGS's failure to reasonably protect Plaintiff's and the Class's SPI, Defendant has not offered any compensation or adequate remedy, especially considering the significant and long-term risk Plaintiff and the Class Members face.

## CLASS ALLEGATIONS

106.    Plaintiff brings this action on behalf of himself and all other similarly situated Class Members pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

107.    Plaintiff seeks to represent a class of person to be defined as follows:

All individuals in the United States and its territories whose SPI was compromised during the RGS Data Breach.

108.    Excluded from the class is Defendant and its subsidiaries and affiliates; all employees of Defendant; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

109.    Plaintiff reserves the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

110.    **Numerosity**. Consistent with Fed. R. Civ. P. 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff is informed and alleges that there are hundreds of thousands of members of the Class. The precise number of class members, however, is unknown to Plaintiff. Class members may be identified through objective means, including RGS's records compromised during the Data Breach. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

111.    **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members.  These common questions include, without limitation:

    a.    Whether RGS knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

    b.    Whether RGS controlled and took responsibility for protecting Plaintiff's and the Class's data when its stored that data on their servers;

    c.    Whether RGS's security measures were reasonable in light of the recommendations of the FTC, state laws and guidelines, and common recommendations made by data security experts;

    d.    Whether RGS owed Plaintiff and the Class a duty to implement reasonable security measures;

    e.    Whether RGS's failure to adequately secure Plaintiff's and the Class's data constitutes a breach of their duty to institute reasonable security measures;

    f.    Whether RGS's failure to implement reasonable data security measures allowed the breach of their data systems to occur and caused the theft of Plaintiff's and the Class's data;

    g.    Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

      h.     Whether Plaintiff and the Class were injured and suffered damages or other losses because of RGS's failure to reasonably protect their data systems; and

      i.      Whether Plaintiff and the Class are entitled to relief.

112.   **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons whose SPI was breached by an unauthorized third party during the Data Breach. Plaintiff's injuries are similar to other Class members and Plaintiff seeks relief consistent with the relief due to the Class.

113.   **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against RGS to obtain relief for himself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel that is competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

114.   **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of

scale, and comprehensive supervision by a single court. A class action would also permit financial institutions to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

115.    **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), RGS, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## CLAIMS

## COUNT I
## Negligence

116.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

117.    Plaintiff brings this claim individually and on behalf of the Class.

118.    RGS owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the highly sensitive data they managed and stored on behalf of their clients. This duty arises from multiple sources.

119.    RGS owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target RGS' data systems, software, and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed. RGS alone controlled its technology, infrastructure, and cybersecurity. Defendant further knew or should have known that if hackers breached its data systems, they would extract sensitive

data and inflict injury upon Plaintiff and the Class. Furthermore, RGS knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen.  Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of RGS' unsecured, unreasonable data security measures.

120.    Additionally, Section 5 of the FTC Act, 15 U.S.C. § 45, required RGS to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of RGS's duty to Plaintiff and the Class. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Defendant, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of RGS's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of § 5 of the FTC Act.

121.    Defendant is obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring Defendant to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

122.    Defendant breached its duty to Plaintiff and the Class by implementing unreasonable data security measures and by failing to keep data security "top-of-mind" despite understanding and writing about the risk of data breaches involving highly sensitive data and touting their own security capabilities.

123.    Defendant was fully capable of preventing the Data Breach. Defendant, as sophisticated and experienced technology company, knew of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited the scope and depth of the Data Breach. Defendant thus failed to take reasonable measures to secure its systems, creating vulnerability to a breach.

124.    As a direct and proximate result of RGS's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

## COUNT II
## Unjust Enrichment

125.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

126.    Plaintiff brings this claim individually and on behalf of the Class.

127.    Due to RGS's wrongful acts and omissions described herein, Defendant have obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

128.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

129.    Plaintiff and Class Members conferred a benefit on Defendant in the form of valuable, personal, confidential information. RGS's business model would not exist save for the need to securely transmit individuals' information on behalf of their clients and customers.

130.    The relationship between Defendant and Plaintiff and Class Members is not attenuated, as Plaintiff and Class Members had a reasonable expectation that the security of their SPI would be maintained when they provided their information to RGS's clients.

131.    RGS accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

132.    RGS appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Upon information and belief, this financial benefit was, in part, conferred, when Defendant was paid by its customers, to provide its customers with the services offered. RGS also benefited from the receipt of Plaintiff's and Class Members' SPI.

133.    RGS also understood and appreciated that the SPI pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

134.    In particular, RGS enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' SPI.

Instead of providing a reasonable level of data security that would have prevented or mitigated the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

135.    RGS failed to secure Plaintiff's and Class Members SPI, and therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

136.    But for RGS's willingness to commit to properly and safely collecting, maintaining, and securing SPI, such information would not have been transferred to and entrusted to Defendant. Further, if Defendant had disclosed that its data security practices were inadequate, RGS would not have gained the trust of its clients or Plaintiff's and Class Members' SPI.

137.    RGS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class Members' SPI, while at the same time failing to securely maintain that information from unauthorized access and compromise.

138.    Plaintiff and Class Members have no adequate remedy at law.

139.    Under principles of equity and good conscience, Defendant should not be permitted to retain any money derived from its acquisition and collection of SPI, or the SPI belonging to Plaintiff and Class Members.

140.   As a direct and proximate result of RGS's wrongful conduct, Plaintiff and Class Members have sustained damages as described in this Complaint.

141.   Plaintiff and Class Members seek an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by RGS, through its clients, from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## COUNT III
## Declaratory and Injunctive Relief

142.   Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

143.   Plaintiff brings this claim individually and on behalf of the Class.

144.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

145.   An actual controversy has arisen in the wake of the Data Breach at issue regarding RGS's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges RGS's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury

due to the continued and ongoing threat of additional fraud against them or on their accounts.

146.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    RGS owed and continue to owe a legal duty to secure the sensitive information with which it entrusted, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

b.    RGS breached, and continue to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal and financial information; and

c.    RGS's breach of its legal duty continues to cause harm to Plaintiff and the Class.

147.    The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its clients' (*i.e.*, Plaintiff's and the Class's) data.

148.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and

the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

149.    The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to RGS if an injunction is issued. Plaintiff and Class members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to RGS of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

150.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

151.    Wherefore, Plaintiff, on behalf of himself and the Class, request that this Court award relief as follows:

A.    An order certifying the class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

B.    An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

C.    A declaratory judgment in favor of Plaintiff and the Class;

D.    Injunctive relief to Plaintiff and the Class;

E.    An award of attorneys' fees and costs as allowed by law; and

F.    An award such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all the claims so triable.

Respectfully submitted,

Dated: October 16, 2023

*/s/ Brian C. Gudmundson*
Brian C. Gudmundson (MN Bar No. 336695)
Michael J. Laird (MN Bar No. 398436)
Rachel K. Tack (MN Bar No. 399529)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

Gary F. Lynch*
Nicholas A. Colella*
Patrick D. Donathen*
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
nickc@lcllp.com
patrick@lcllp.com

*Pro hac vice forthcoming*

*Attorneys for Plaintiff and the Putative Class*